UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-23349-CIV-ALTONAGA/Brown

HAMID M. GHARAGOZLOO,
an individual,

       Plaintiff,

vs.

AETNA LIFE INSURANCE CO.,
a Connecticut corporation; and
UNIVERSITY OF MIAMI,
a Florida corporation,

       Defendants.
_____/

## ORDER

**THIS CAUSE** came before the Court upon Defendant, Aetna Life Insurance Company's ("Aetna['s]") Motion for Summary Judgment [D.E. 44]; and Defendant, University of Miami's (the "University['s]") Motion for Summary Judgment [D.E. 46].[1]  The Court has carefully reviewed the parties' written submissions, the administrative record, and applicable law.

## I. BACKGROUND[2]

This case arises under the Employment Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA").  Plaintiff, Hamid Gharagozloo ("Gharagozloo"), was employed by the University as a senior research associate, with duties primarily consisting of computer programming and statistical analysis.  (*See* Aetna's Statement of Undisputed Material Facts ("*Aetna's Facts*")

---

[1] The University did not file a substantive motion of its own; rather, it joined in Aetna's Motion for Summary Judgment.

[2] Unless otherwise noted, the facts are undisputed.  References to the Administrative Record are designated with the letter "A" followed by the stamped page number.  The Administrative Record is found at docket entry number 47.

Case No. 08-23349-CIV-ALTONAGA/Brown

[D.E. 45] at 5).  Gharagozloo had long term disability coverage ("LTD") under an employee benefit plan through the University.  (*See id*. at ¶ 1).

A.      **The Plan Documents**

The parties disagree as to which document controls in this case.  Gharagozloo claims the University's "Long Term Disability Plan" governs his benefits.  (*See* Gharagozloo's Response to Aetna's Motion for Summary Judgment ("*Gharagozloo's Resp*.") [D.E. 60] at 2-3; *see* Long Term Disability Plan ("*LTD Plan*"), Complaint [D.E. 1] at 13-41).  According to Aetna, the "Summary Plan Description" ("SPD"), submitted as part of the Administrative Record, controls.  (A1 53).[3] Gharagozloo claims he had never seen the SPD referenced by Aetna until the current litigation commenced, when Aetna provided him with the administrative record for review.  (*See Gharagozloo's Resp.* at 2).  Aetna concedes that the issue of which document controls is immaterial to a determination of whether Aetna correctly denied benefits, and Gharagozloo does not contest that assertion.  Nonetheless, the particulars of the competing plan documents are relevant as to the definition of disability for coverage purposes and the description of the Plan administrator.

1.      "Disability" for Coverage Purposes

Gharagozloo maintains that the LTD Plan governs his claim, and the LTD Plan defines disability as follows:

---

[3] The LTD Plan does not include an effective date.  But because the LTD Plan begins with two Amendments which state they become effective as of July 1, 1998, the LTD Plan must have been in effect prior to July 1, 1998.  The SPD states on its face that it becomes effective January 1, 2005, and the date of Aetna's signature on the SPD is April 4, 2006.  However, The SPD submitted in the administrative record is not a cohesive document, but rather what appears to be an amalgam of various documents, with several different dates; some pages contain footers dated 10/23/2008.

Case No. 08-23349-CIV-ALTONAGA/Brown

2.5   <u>Disability/Disabled</u> means in the case of an Eligible Employee, the complete inability to perform any and every duty of his/her occupation during the first sixty (60) months of receipt of Long-Term Disability Payments.  The inability to perform duties of any other occupation for which the person is reasonably capable due to education, training, or experience as a result of Injury or Illness after that sixty (60) month period is included in the definition.

(*LTD Plan* at 3).

Aetna relies on the SPD documents, under which disability benefits will be provided to an employee who becomes disabled and remains disabled through a waiting period.  (*See* A1 5).  The SPD defines the test of disability for entitlement to benefits as follows:

**Test of Disability**

In the first 24 months of a period of disability, you will be deemed disabled on any day if:
- you are not able to perform the **material duties** of your **own occupation** solely because of: disease or **injury**; and
- your work earnings are 80% or less of your **adjusted predisability earnings**.

After the first 24 months of a period of disability, you will be deemed disabled on any day if you are not able to work at any **reasonable occupation** solely because of:

- disease; or
- **injury**.

(A1 5) (emphasis in original).[4]

2.   <u>The Plan Administrator</u>

The LTD Plan defines the administrator as follows: "<u>Administrator or Plan Administrator</u> means the University of Miami.  All communications regarding this Plan should be addressed to the

---

[4] Depending upon which document governs, Gharagozloo would, if disabled from his occupation, be entitled to at least two years of coverage under the SPD or at least sixty months of coverage under the LTD Plan.

3

Case No. 08-23349-CIV-ALTONAGA/Brown

Employee Benefits Office, P.O. Box 248106, Coral Gables, Florida 33124-1415." (*LTD Plan* at 1).[5]

No mention is made of any role for Aetna in the administration of the Plan.

The SPD describes the administrator, and Aetna's role, somewhat differently.  The SPD

states as follows:

> The Contractholder [the University] hereby delegates to Aetna authority to make determinations on  behalf of the Contractholder with respect to benefit payments under the Plan and to pay such benefits, subject, however, to a right of Contractholder to review and modify any such determination.  For the purposes of the Federal "Employee Retirement Income Security Act of 1974" and any applicable state legislation of similar nature, the Contractholder shall, however, be deemed the administrator of the Plan.

(A1 35).

### B.      Gharagozloo's Disability Claim

On August 31, 2006, Gharagozloo filed a disability claim with Aetna, claiming he was unable

to work due to severe pain in his hands.  (*See* A1 55).  He explained that he had been diagnosed with

carpal tunnel syndrome ("CTS") and ulnar nerve neuropathy.  (*See id.*).  Along with the application

by Gharagozloo were forms completed by his treating physician, Dr. Kenneth Easterling

("Easterling").  Easterling stated that Gharagozloo suffered from pain and numbness in his hands and

was diagnosed with bilateral median neuritis and right ulnar neuritis, and was taking the prescription

drug, Ultram, to ease the pain.  (*See* A1 56-57).  Easterling stated that Gharagozloo could spend no

more than four hours per day at a computer keyboard.  (*See* A1 60).

---

[5] The paginated portion of the LTD Plan is preceded by numerous unnumbered pages.  The section referenced is most easily found by reference to docket entry number 1 at 21.

On December 5, 2006, Aetna requested additional information in order to review Gharagozloo's claim. (*See* A1 70). Specifically, Aetna asked for Gharagozloo's medical records from January 1, 2006 to the date of the request, including all diagnostic testing. (*See id*.). Gharagozloo submitted several follow-up reports written by Easterling. In a March 6, 2006 Progress Note, Easterling reported that Gharagozloo suffered from bilateral median neuritis and right ulnar neuritis, and there was no change in his symptoms since the last visit. (*See* A1 73). He further reported that Gharagozloo's prescription for Ultram was renewed. (*See id*.). A July 3, 2006 Progress Note stated that Gharagozloo had reported worsening of the numbness in his left radial digits and right medial elbow pain that he did not have previously. (*See* A1 74). It also reported:

> On examination Tinel's sign is present over the ulnar nerve at the right elbow and he has discomfort with compression of the ulnar nerve. Two-point discrimination in the right hand remains 6 millimeters in all digits. There is no intrinsic muscle weakness or atrophy.
>
> On the left side Tinel's sign is present over the carpal tunnel and Phalen's test is positive, causing tingling in the median territory. Two-point discrimination is 6 millimeters in all digits and there is no intrinsic muscle weakness.

(*Id*.).

The report indicated that Easterling treated Gharagozloo with a cortisone injection in the left carpal tunnel, and Easterling was curious as to whether the injection might alleviate the symptoms. (*See* A1 75). Another Progress Note, dated August 28, 2006, indicated that Gharagozloo had received some relief from the cortisone injection and received two more injections during the August 28 visit. (*See* A1 76). Easterling further reported that the ideal solution to Gharagozloo's problem would be a job that was less strenuous to his hands. (*See id*.). Easterling stated he did not believe Gharagozloo was a surgical candidate, and that nerve conduction studies had been within normal

limits in the last few years. (*See id*.). Finally, Easterling stated that Gharagozloo had reached maximum medical improvement and was impaired at four percent of the whole person. (*See* A1 77). He also indicated Gharagozloo could work no more than four hours a day at the computer. (*See id*.).

A Progress Note dated November 27, 2006 stated that although Gharagozloo had stopped working about three months earlier, he reported no improvement in his symptoms. (*See* A1 78). The diagnosis remained unchanged, and Easterling noted that Gharagozloo remained partially disabled from his customary occupation as a computer programmer, and was limited to four hours per day of repetitive hand movement. (*See id*.).

On January 19, 2007, Aetna requested more information in order to review Gharagozloo's claim. (*See* A1 89). Aetna requested physician office notes from December 1, 2006 until the date of the request, along with any test results from Dr. Easterling. (*See id.*). In February 2007, Gharagozloo retained an attorney to represent him in his disability claim. (*See* A1 91-2). The attorney wrote to Aetna and stated that Gharagozloo had been informed by an Aetna representative by telephone that his disability claim had been denied, and noted that an official denial letter in compliance with ERISA was required. (*See id*.).

On April 20, 2007, Aetna sent a letter to the attorney regarding Gharagozloo's claim. (*See* A2 101). In that letter, Aetna explained that based upon Gharagozloo's job description and the medical notes from Easterling,

> [T]he medical evidence provided is insufficient to support that Mr. Gharagozloo is unable to perform the material duties of his own occupation. According to the information provided by Mr. Gharagozloos' [sic] restrictions were accommodated by his supervisor for several years. Since these restrictions were accommodated for this length of time these restrictions are considered the "material duties" of his job and insured as his "own occupation" under the disability plan. Based on this

Case No. 08-23349-CIV-ALTONAGA/Brown

information, we have determined that your client is not disabled from his own occupation.

(A2 104). The attorney requested Gharagozloo's claim file to prepare an appeal. (*See* A2 107). On November 29, 2007, Grisham filed the appeal. (*See* A2 128).

Gharagozloo's appeal detailed his medical history since the inception of his symptoms in 1996. (*See* A2 128-157). Beginning in 1996, Gharagozloo developed intense pain in both hands and arms whenever he used a computer, drove a car, or wrote for longer than one hour. (*See* A3 268-70). Gharagozloo consulted an internist and neurologist about his condition and was diagnosed with carpal tunnel syndrome by his neurologist, Dr. Tobin ("Tobin). (*See* A2 163-64). Gharagozloo's disability insurance company at the time ordered an independent examination of Gharagozloo to determine the problem. (*See* A2 179). Dr. Anthony Dorto ("Dorto"), a disability specialist, examined Gharagozloo and stated that although Gharagozloo had a normal nerve conduction test, Dorto nonetheless found the prognosis to be guarded. (*See id.*). Dorto opined that Gharagozloo should not engage in continuous keyboard work or return to computer keyboard work as a primary source of his income. (*See id.*).

In 1997, Gharagozloo underwent surgery on his right wrist to relieve the pain caused by CTS. (*See* A2 163). Following the surgery, the pain did not abate, and Gharagozloo sought treatment at the University of Miami's Pain Center. (*See id.*). Gharagozloo began treatment with Dr. Alexander Angelides ("Angelides"), a hand and upper extremity surgeon. (*See id.*). Angelides diagnosed Gharagozloo with CTS, and stated that Gharagozloo was to avoid repetitive motion, and be placed on modified work duty. (*See* A2 161). Angelides reported the following:

7

Case No. 08-23349-CIV-ALTONAGA/Brown

The patient had a positive Tinel sign over the elbow joint medially over the ulna nerve.  There is a positive Tinel sign over the volar aspect of the wrist with paresthesias into the hand.  There is full range of motion of the forearm, wrist and hand.  The patient had similar findings of the left upper extremity.

IMPRESSION:

1. Status-post carpal tunnel release.
2. Neurapraxia median nerves right and left hands.
3. A possible compression with neurapraxia ulna nerves right and left elbows.

COMMENT:

The patient's findings and symptoms are consistent with his past medical history.

TREATMENT & RECOMMENDATIONS:

I would suggest that the patient obtain new up to date neurological studies to rule out any compression of the ulna nerves at the elbow joints or wrist joints**.  I see no reason why this patient could not return to light work.  He could be on some repetitive motion with limited computer work of no more than 4 hours per day.** The patient does not want any further surgery or treatment but I think he should be further evaluated before he makes this decision.  Neurological studies were not ordered but are recommended and I would happily review them once they have been obtained.  If nothing further is done **the patient could return to light work.  He should avoid constant repetitive motion**.  The patient is currently left with a 6 % permanent partial disability of the body.

(A2 164) (emphasis in original).

Over the next year, Angelides performed examinations of Gharagozloo and documented findings of tinel and phalen signs.  (*See* A2 164, 169, 171).  Angelides further documented that Gharagozloo consistently complained of shooting pain in this hands, wrists, fingers, forearms, feelings of numbness, and feelings of "electric shock" in this hands.  (*See id.* and A2 167).  Angelides noted that Gharagozloo's symptoms worsened after typing more than four hours per day,

8

Case No. 08-23349-CIV-ALTONAGA/Brown

and Angelides counseled Gharagozloo to limit his keyboard work to less than four hours per day. (*See* A2 167, 169, 171).

On November 1, 2000, Gharagozloo began treatments with Easterling, who remained Gharagozloo's treating physician through the period in which Gharagozloo sought disability benefits. (*See* A2 173-75). Easterling's initial diagnosis was that Gharagozloo suffered from bilateral medial and ulnar nerve entrapment neuropathy. (*See* A2 175). Easterling recommended that Gharagozloo "severely limit the time he spends doing keyboard work." (*Id*.). In follow-up reports, Easterling repeatedly diagnosed Gharagozloo with bilateral medial and ulnar nerve entrapment neuropathy, bilateral CTS, right ulnar neuritis, bilateral median neuritis, and status post right carpal tunnel release. (*See* A2 185-86, 189-90, 192-06, 200, A3 208-09, 214-18). Easterling cautioned Gharagozloo to restrict his keyboard work to no more than four hours per day. (*See id*.). Easterling advised Gharagozloo's original disability insurance company that "[n]erve conduction studies are only one element of painful peripheral neuropathy, and electrodiagnostic findings do not always correlate well with clinical findings and symptoms." (A2 179).

On November 18, 2007, in preparation for the appeal of his disability claim, Gharagozloo underwent an independent medical examination with board certified medicine and rehabilitation specialist, Dr. Craig H. Lichtblau ("Lichtblau"). Lichtblau reported as follows:

> The patient continues to present with constant bilateral hand and wrist pain described as a two to three out often on the 1-10 scale for pain, which can go as high as a six to seven out of ten with increased activity or typing greater than 15 minutes. The patient continues to have shooting pain and numbness and tingling in the thumb of his left hand and the second digit of his left hand. He continues to have pain in digit three of his right hand and numbness and persistent tingling in the fifth digit of his right hand. The patient's symptoms are exacerbated with typing, writing, or even holding the phone, for greater than 15 minutes. The patient has taken pain

Case No. 08-23349-CIV-ALTONAGA/Brown

medications, which do help relieve his pain; however, they cause unwanted side effects.

The patient's occupation demands concentration and focus, which would be affected when taking the current medication. The patient has side effects, which include spaciness, drowsiness, difficulty concentrating, and nausea.  It is my opinion that these side effects would interfere with his ability to perform his work duties, which include concentration and focus as he is involved in performing statistical analyses of research papers.  It is my opinion that the patient's pain level and side effects from his medication would interfere with his ability to function in a sedentary occupation. The medications would continue to cause drowsiness and nausea, which would interfere with his ability to concentrate and perform.   The patient's current occupational duties would not allow for frequent breaks as there is a plethora of data and work, which has to be analyzed and researched.

I performed an EMG/Nerve Conduction Study today in my office and this was found to be within normal limits.  There was no electrodiagnostic evidence of peripheral neuropathy, peripheral entrapment neuropathy or radiculopathy.   It must be understood that even through the electrodiagnostic test was negative, this patient in my opinion is suffering from an inflammatory process causing him chronic pain and discomfort.  As a result of this patient's chronic pain and discomfort, he has a significant disability, which will impose significant work restrictions.

In regards to the patient's ability to return to work. it is my medical opinion as a Board Certified Physiatrist that given his current condition, including his symptoms and side effects from pain medications, the patient is unable to work four hours per day on an uninterrupted basis in his current occupation.  The patient has an excess of pain after only 15 minutes of typing, writing, or even being on the phone.  It is my opinion that the patient would only continue to experience additional pain and suffering if he continued to perform his current job duties.

After obtaining a history, performing a physical examination, and reviewing medical records, as well as performing mv own EMG/Nerve Conduction Study, it is my medical opinion as a Board Certified Physiatrist that this patient does not have the physical functional capacity to perform the duties in his current occupation as a statistical programmer.  It is my opinion that the patient would be unable to perform sedentary work requiring consistent typing due to his current condition.

The above opinion is expressed within a reasonable amount of medical certainty.  It is based upon medical records provided to me, my objective physical examination findings, and the patient's subjective accounts .and complaints.  If any new

10

Case No. 08-23349-CIV-ALTONAGA/Brown

information is provided to me it will be considered and the evaluator reserves the right to amend his opinion based upon the information provided to him.

(A3 236-37).

After receiving the appeal, along with Lichtblau's report, Aetna engaged Vaughn Cohan,

M.D. ("Cohan"), a physician board certified in neurology, to review Gharagozloo's medical records.

Cohan reported as follows:

> The claimant underwent an independent medical evaluation by Craig Lichtblau, MD, a specialist in Physistry, on 11/19/07.  This IME was performed at the request of the claimant's attorney, Alicia Paulino-Grisham.  Dr. Lichtblau reviewed the claimant's history, and he performed a physical examination on that date as well.  Examination revealed positive Tinel signs at both wrists and at the right elbow and positive Phalen tests in both hands. . . .  He also performed yet another electrodiagnostic study which found no abnormalities on nerve conduction testing and electromyography of the upper extremities bilaterally.  Dr. Lichtblau concluded that the claimant was suffering from "an inflammatory process causing him chronic pain and discomfort."  He stated that this was his opinion despite the normal electrodiagnostic testing which had been performed on several occasions . . . .

(A5 450).  Cohan further reported that

> While I do agree that those diagnoses can be made on clinical grounds in the presence of normal electrodiagnostic testing, that particular scenario would be expected earlier in the history of such a condition, but given a period of ten years of continued clinical symptomatology, one would expect progressively abnormal electrodiagnostic findings and the presence of abnormal neurological exam signs including sensory and motor abnormalities consistent with the anatomic distribution of the bilateral median and/or ulnar nerves and the presence of atrophic changes of the relevant intrinsic muscles of the hands.  Therefore, it is my opinion that the particular diagnoses opined in this case are subject to question and cannot be accepted based on the information submitted.

(*Id*.).

11

Case No. 08-23349-CIV-ALTONAGA/Brown

Aetna had another review of Gharagozloo's records performed by Leela Rangaswamy, M.D.

("Rangaswamy"), board certified in orthopaedic surgery with added expertise in hand surgery.  (*See*

A5 453-459).  Rangaswamy reported that

> From 03/01/07 until the last report (IME report of 11/19/07), the submitted data does
> not document any musculo-skeletal or neurological deficit that would be
> commensurate with functional limitation.  The claimant's complaints are diffuse and
> ill-defined and do not follow characteristic patterns of an entrapment neuropathy.
> Furthermore, the EMG/NCV studies of both upper extremities have been consistently
> normal.  If the claimant had a definite pathological lesion, over the years the
> electrophysiological study would have shown definitive involvement.  Therefore,
> based on consistently normal electrophysiological studies, one must conclude that the
> claimant in fact does not have any evidence of peripheral entrapment neuropathy.

(A5 458).

On February 20, 2008, Aetna informed Gharagozloo that his appeal was denied, and that he

would receive no long-term disability benefits.  Pursuant to ERISA's judicial review provision,

Gharagozloo filed suit against Aetna and the University, claiming they wrongfully denied his

disability benefits.  Defendants now move for summary judgment.

## II.  LEGAL STANDARD

Summary judgment shall be rendered "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law."  Fed. R. Civ. P. 56(c).  In making this assessment, the Court "must view all the evidence

and all factual inferences reasonably drawn from the evidence in the light most favorable to the

nonmoving party,"  *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th

Case No. 08-23349-CIV-ALTONAGA/Brown

Cir. 1997), and "must resolve all reasonable doubts about the facts in favor of the non movant." *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.*, 894 F.2d 1555, 1558 (11th Cir. 1990).

"By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. Likewise, a dispute about a material fact is a "genuine" issue "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"For factual issues to be considered genuine, they must have a real basis in the record . . . mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (citations omitted). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. In those cases, there is no genuine issue of material fact "since a complete failure

13

Case No. 08-23349-CIV-ALTONAGA/Brown

of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

## III. ANALYSIS

The Eleventh Circuit has established a six-step process "'for use in judicially reviewing virtually *all* ERISA-plan benefit denials.'" *White v. Coca-Cola Co.*, 542 F.3d 848, 853 (11th Cir. 2008) (emphasis in original) (quoting *Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132, 1137-38 (11th Cir. 2004)).  This process involves the following analysis:

(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.*, the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine  whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Id*. at 853-54.[6]

---

[6] The Eleventh Circuit in *White* notes that *Metropolitan Life Insurance Co. v. Glenn*, 128 S. Ct. 2342 (2008), calls into question the heightened standard required in the sixth step in the *Williams* analysis. *Id.* at 854.  This case does not reach the sixth step of the analysis.

14

Case No. 08-23349-CIV-ALTONAGA/Brown

A.      **Was the Administrator's Decision Wrong?**

The Eleventh Circuit has explained that the first level of review of an administrator's

decision to deny benefits is *de novo* review.

> *De novo* review, which we employ in reviewing "no-discretion" plan decisions,
> offers the highest scrutiny (and thus the least judicial deference) to the
> administrator's decision. In fact, we accord *no* deference there, since, no
> judgment/discretion  was exercised in making the determination (*i.e.*, there is no
> discretion to which we would defer).

*Williams*, 373 F.3d at 1137 (emphasis in original).  To determine whether the administrator's

decision was wrong, the Court is limited to the administrative record that was before Aetna when

it made its decision.  *See Glazer v. Reliance Std. Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir. 2008).

Gharagozloo argues that Aetna decided to deny his disability claim against all reason, in the

face of years of documented medical evidence that established he was disabled from his occupation.

Gharagozloo points out his CTS had been initially diagnosed ten years earlier, in 1996, and had

steadily worsened.  He tried surgery, cortisone injections, anti-inflammatory and pain medications,

and nonetheless reached the point where he could no longer perform his job, which required all-day

keyboard usage.  Over a ten-year period, his doctors repeatedly counseled him that he could not use

a keyboard for eight hours a day in his condition.

Gharagozloo notes he was first diagnosed with CTS by Tobin, his neurologist, in 1996, and

an independent medical examination related to Gharagozloo's earlier insurance policy confirmed the

CTS diagnosis.  Both Angelides and Easterling, upper extremity and hand specialists, diagnosed

Gharagozloo with CTS and cautioned that he could not work at a keyboard for eight hours a day.

An independent examination following the denial of Gharagozloo's benefits resulted in yet another

15

Case No. 08-23349-CIV-ALTONAGA/Brown

specialist determining that Gharagozloo's condition precluded his working at a keyboard for eight hours a day.  Given that Gharagozloo's job consisted of keyboard work for eight hours per day, Gharagozloo argues a wealth of medical documentation supports a finding that he was clearly disabled from his occupation.

Aetna's first justification for denying benefits to Gharagozloo is that he did not actually have CTS when he applied for disability benefits.  Aetna begins by explaining that CTS is a "'complex of symptoms resulting from compression of the median nerve in the interior passageway of the wrist, with pain and burning or tingling in the fingers and hand, sometimes extending to the elbow.'" (Aetna's Motion for Summary Judgment ("*Aetna's Mot.*") [D.E. 44] at 5-6, quoting *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (citing Dorland's Illustrated Medical Dictionary (28th Ed. 1994)). Aetna further explains that "[c]arpal tunnel syndrome can be diagnosed by physical examination findings or through 'diagnostic studies, such as nerve conduction tests or electromyography.'" (*Aetna's Mot*. at 6 (quoting Taber's Cyclopedic Medical Dictionary, p. 349)).

Aetna maintains that although Easterling initially diagnosed Gharagozloo with CTS, after Gharagozloo's nerve conduction studies came back normal, Easterling changed his diagnosis to simple "neuritis."  Neuritis, Aetna asserts, is merely an inflammation of the nerve.  (*See Aetna's Mot*. at 6).  Aetna points out that Lichtblau also referred to Gharagozloo's condition as "inflammatory" and did not use the term CTS.  (*See id*.).

Gharagozloo argues that neither Easterling nor Lichtblau determined no neuropathy was evidenced.  Gharagozloo notes that throughout the years of treatment, Easterling used the terms "CTS," "median neuropathy," and "median neuritis" interchangeably.  (*See Gharagozloo's Resp*. at

16

Case No. 08-23349-CIV-ALTONAGA/Brown

18, citing numerous portions of the Administrative Record).[7] Indeed, a review of Easterling's reports reveals he did use the terms interchangeably, while maintaining a consistent diagnosis that Gharagozloo suffered from extreme pain in his hands, which was exacerbated by continued keyboard use. Moreover, Lichtblau did not state that Gharagozloo merely had a vague inflammatory condition, as Aetna contends, but that Gharagozloo suffered from an "inflammatory process causing him chronic pain and discomfort," and that "he has significant disability, which will impose significant work restrictions." (A3-236). Aetna's argument that Gharagozloo did not suffer from CTS based on Easterling's and Lichtblau's reports is pure semantics, and in any event, does not address the issue of whether Gharagozloo suffered from a physical disability that prevented him from performing his job.[8]

---

[7] Gharagozloo also points out that the terms are used interchangeably throughout the healthcare industry, citing the Journal of the American Medical Association: "'[t]he syndrome resulting from compression of the median nerve at the wrist has been designated variously: *median neuritis*, median thenar neuritis, professional or occupational median neuritis, thenar neural atrophy, partial thenar atrophy, thenar palsy, tardy median palsy, *median neuropathy*, and, most commonly at present, *carpal tunnel syndrome*.' L. Emerson Ward, M.D; William H. Bickel, M.D.; Kendall B. Corbin, M.D., *J Am Med Assoc*. 1958; 167(7): 844-846 (emphasis added)." (*Gharagozloo's Resp*. at 18, n.25).

[8] Aetna's suggestion that Easterling changed his diagnoses is also meritless. Easterling did not, as Aetna suggests, do an "about face" after Gharagozloo's benefits were denied. All along, Easterling had diagnosed Gharagozloo with CTS. Although he did use a variety of terms to describe the condition at different times, Easterling nonetheless consistently explained that Gharagozloo's condition caused him to be unable to perform keyboarding work for eight hours per day, a requirement of Gharagozloo's job.

Aetna also refutes what it terms Lichtblau's determination that Gharagozloo was disabled as a result of taking the pain medication, Ultram. Lichtblau's report did not state that taking Ultram caused Gharagozloo to be disabled. Rather, Lichtblau noted that in addition to disabling pain, Gharagozloo suffered side effects from the medication that could interfere with his ability to concentrate. In any event, the issue of Gharagozloo's medication is not relevant to whether he was physically disabled from his job.

Case No. 08-23349-CIV-ALTONAGA/Brown

Aetna next attempts to align this case with other ERISA carpal tunnel syndrome cases in which courts upheld the denial of disability benefits.  In *Hallford v. Metropolitan Life Insurance Company*, the district court affirmed the administrator's denial of benefits to a plaintiff who alleged she had carpal tunnel syndrome.  367 F. Supp. 2d 1353 (N.D. Fla. 2005).  The plaintiff, Hallford, was a telephone operator for AT&T for 30 years.  *Id*. at 1356.  In 1985, Hallford overextended her wrists, and eventually underwent carpel tunnel release surgery on her right hand.  *Id*.  She returned to work, but in 1994 reported increased pain to her physician/surgeon, Dr. Tappan, who recommended that she stop using a computer keyboard.  *Id*.  In 1998, Hallford sought treatment for severe numbness in her hands.  *Id*.  Dr. Tappan performed nerve conduction and needle electromyography studies, which came back with normal results.  *Id*.  Based on Hallford's symptoms and medical history, Dr. Tappan diagnosed Hallford with CTS and recommended that she discontinue repetitive computer work.  *Id*.  A second opinion confirmed Dr. Tappan's diagnosis.  *Id*.

Hallford underwent carpal tunnel release surgery on her left hand and eventually attained a level of 50% functionality, but continued to complain of pain.  *Id*.  Hallford then had an episode where one of her fingers turned blue due to a blood clot, which required an angioplasty.  *Id*.  Hallford received a year of "accident" pay due to the blood clot and then received two years of workers' compensation pay.  *Id*.  Finally, Hallford received one year of "sickness" benefits under AT&T's Sickness and Accident Disability Benefits Program.  *Id*.  Hallford then filed for long term disability benefits, claiming carpal tunnel syndrome prevented her from performing her job.  *Id*. at 1357.

In support of her application for benefits, Hallford included a report from Dr. Tappan.  *Id*. Dr. Tappan stated that Hallford suffered from CTS and enumerated various physical acts she was

18

Case No. 08-23349-CIV-ALTONAGA/Brown

capable of performing.  Dr. Tappan did not fill out the "prognosis" section of the application, and in response to the question of whether Hallford was able to perform her job duties, he wrote, "Depends on job." *Id.*  He made reference to a functional capacity evaluation performed on Hallford that stated she could not perform her job as telephone operator.  The evaluation also listed the physical activities she remained capable of doing.  *Id.*

A nurse consultant engaged by MetLife to review Hallford's application and records determined Hallford was not totally disabled.  *Id.*  The file was also reviewed by a vocational rehabilitation consultant who determined that, given her training, education, experience, and disability, Hallford could perform as an (a) information clerk; (b) systems surveillance monitor; or (c) receptionist.  *Id.*  Each of these occupations were within the geographic region of Hallford's home.  *Id.*  MetLife denied Hallford's application, and Hallford appealed.

In her appeal, Hallford included a medical report from Dr. Tappan which indicated she could not perform her duties as a telephone receptionist due to carpal tunnel syndrome.  *Id.* Dr. Tappan opined that Hallford was unable to climb, engage in repetitive fine finger movements, engage in repetitive eye-hand movements, or engage in pushing and pulling with either hand.  *Id.*  Dr. Tappan stated that Hallford could sit, stand, or walk over the course of a normal day, and could lift up to 10 pounds.  *Id.*  Hallford submitted the results of an independent medical exam performed by Dr. Rappa, in which he disagreed with Dr. Tappan's diagnosis.  *Id.* at 1358.  Hallford also submitted a report from a medical records review performed by Dr. Rogers.  Dr. Rogers found there were clinical signs of carpal tunnel syndrome, but no wasting and no evidence of sensory denervation. *Id.*

19

Case No. 08-23349-CIV-ALTONAGA/Brown

MetLife gave Hallford's file to Dr. Chrnell for an independent review.  *Id*.  Chrnell took issue

with Dr. Tappan's suggestion that Hallford could only lift 10 pounds and that she could not climb,

as there was no objective documentation for those determinations.  *Id*.  Dr. Chrnell concluded

Hallford was capable of sedentary light duties.  *Id*.  Relying on all of the medical evidence before

it, MetLife denied Hallford's disability claim.  *Id*.

In affirming the administrator's decision, the district court found as follows:

It is plain that MetLife's decision to deny Hallford's LTD benefits application
was based on substantial evidence.  Even those portions of the record which are most
supportive of Hallford's claim, such as Dr. Tappan's APS, do not show that Hallford
was totally disabled.  According to the APS, Hallford could sit, stand, or walk over
the course of a normal eight-hour work day, that she could lift up to 10 pounds
occasionally, reach above should level, twist, bend, stoop, and engage in repetitive
eye hand movements.  When asked why Hallford was unable to perform her job
duties, Dr. Tappan gave the noncommital answer "Depends on job," and failed to
complete the prognosis section of the APS form, and thus did not indicate his opinion
whether Hallford could work in her own or another occupation.  Administrative
Record, at 81.  Even accepting these restrictions, the TSA performed by MetLife's
vocational rehabilitation consultant identified several occupations Hallford could
perform, each of which was available in the geographic area near Hallford's home.
Administrative Record, at 129-30.

There is also significant evidence in the record tending to show that Hallford's
hands' condition was less disabling than Dr. Tappan's APS indicated.  Dr. Rappa's
IME of Hallford stated that there was no "objective diagnostic evidence" supporting
a diagnosis of carpal tunnel syndrome, and that "the symptoms in [Hallford's] hands
[were] not totally consistent with carpal tunnel syndrome."  Administrative Record,
at 168.  Specifically, Dr. Rappa noted that it was quite rare for a person to have carpal
tunnel syndrome in both hands as Hallford claimed, and that there was no
radiographic data supporting the diagnosis.  Dr. Rappa also noted that Hallford's
condition did not improve after the carpal tunnel release surgery, which would be
unusual if she had carpal tunnel syndrome.  Most tellingly, Dr. Rappa observed IME
that Hallford demonstrated a full range of motion in her upper extremities when
distracted, indicating that her condition may have been overstated or psychological
in origin.

Case No. 08-23349-CIV-ALTONAGA/Brown

These conclusions were supported by Dr. Rogers, who stated that "there [was] no wasting and certainly no evidence of sensory denervation" in Hallford's arms. Administrative Record, at 173. They were also supported by Dr. Chrnell, who wrote that there was no objective evidence supporting a diagnosis of carpal tunnel syndrome, and "no justifications [in Dr. Tappan's APS] for limiting Ms. Hallford's lifting to only 10 pounds occasionally or no objective documentation of a reason why she cannot climb." Administrative Record, at 254. Given this evidence, MetLife's decision that Hallford was not totally disabled was completely appropriate.

*Id*. at 1361-62.

In reliance on *Hallford* in support of its decision to deny benefits to Gharagozloo, Aetna states:

In the specific context of disability claims based on carpal tunnel syndrome, Aetna's reliance on the reviewing physicians' analyses of the objective EMG and nerve conduction testing is supported by on-point ERISA precedent, including a decision of a district court in Florida that was affirmed by the Eleventh Circuit. *See Hallford v. Met. Life Ins. Co.*, 367 F. Supp.2d 1353, 1356-58 (N.D. Fla. 2005), *aff'd*, 158 Fed.Appx. 198, 2005 WL 3159939 (11th Cir., Nov. 29, 2005) (entering summary judgment for administrator where treating physician diagnosed plaintiff with bilateral carpal tunnel syndrome, but "electromyography and nerve conductive studies" were "normal," and reviewing physician "noted the lack of objective evidence supporting a diagnosis of carpal tunnel syndrome") . . . .

(*Aetna's Mot*. at 9-10). It is disingenuous to suggest that *Hallford* is on point with the facts of this case. Aetna fails to mention several glaring differences between the two sets of facts.

First, in *Hallford*, it was undisputed that the plaintiff could perform various sedentary jobs other than that of telephone operator. Hallford's own treating physician stated it "depends on job" as to whether Hallford could perform. Notably, in Hallford's case, it was required that she be disabled from *all employment* in order to collect benefits. That is not the case here. The parties do not dispute that, under whichever is the plan at it issue, Gharagozloo needs only to be disabled from performing *his own job* – a computer programmer – to obtain initial disability benefits.

21

Case No. 08-23349-CIV-ALTONAGA/Brown

Also quite different from the present case is the fact that the physician performing the independent medical examination of Hallford disagreed with her treating physician that she suffered from CTS. Here, each physician who examined Gharagozloo agreed he suffered from CTS and could not perform repetitive keyboarding for eight hours a day. Five separate physicians agreed on this point; it was only the reviewing doctors, who did not examine Gharagozloo, who determined CTS was not evidenced. Moreover, the doctor performing the independent medical examination noted that when distracted, Hallford had full range of movement, suggesting her condition might be partly psychological. Here, there has been no suggestion that Gharagozloo's condition is psychosomatic or anything other than a pure physical limitation. *Hallford* in no way supports Aetna's position that Gharagozloo's benefits were properly denied.

Aetna also cites *Marquez-Massas v. Squibb Mfg., Inc.*, 344 F. Supp. 2d 315 (D.P.R. 2004), as an "on-point" case, on the basis that the court upheld the denial of benefits where "'electrodiagnostic test results' showed 'normal nerve conduction,' and reviewing physician found 'no objective medical evidence that would support findings of median nerve entrapment at the wrists associated with carpal tunnel syndrome.'" (*Aetna's Mot.* at 10). Without going into an in-depth discussion of that case, the Court notes that, as in *Hallford*, and unlike the present case, the plaintiff in *Marquez-Massas* would not receive benefits if she was able perform *any* job, not just her own. *Id*. at 323. Marquez- Massas's two treating physicians disagreed as to whether she was disabled. *Id*. at 324. A functional capacity evaluation revealed Marquez-Massas could perform work of a sedentary nature. *Id*. And while Aetna relies on the fact that the physician reviewing the file found there was "no objective medical evidence that would support findings of median nerve entrapment

22

Case No. 08-23349-CIV-ALTONAGA/Brown

at the wrists associated with carpal tunnel syndrome," *id*. at 326, the plaintiff never complained of carpal tunnel syndrome; she had *back problems*.

None of the cases cited by Aetna support its position.[9]  In each of the those cases, the administrator reviewed a record replete with differing opinions from the plaintiffs' own treating physicians.  On top of those conflicting opinions, diagnostic tests failed to confirm a diagnosis of disability.  For the administrator to rely on physicians who reviewed the records was therefore not unreasonable.  In this case, however, as has been summarized, all of Gharagozloo's treating physicians found he could not perform his work as a computer programmer because of the disability caused by CTS.  This case presents a very different scenario from the cases relied upon by Aetna.

For his part, Gharagozloo points to a carpal tunnel syndrome case in which the denial of benefits was overturned by the district court, *Patrick v. Hewlett-Packard Co. Employee Benefits*, 638 F. Supp. 2d 1195 (S.D. Cal. 2009).  In *Patrick*, the court determined the administrator had erred in a number of ways.  First, the court found the administrator had failed to consider whether Patrick's condition would worsen if she returned to work.  Patrick's medical records indicated that when she returned to work, her condition worsened, but when she was not working, her condition improved. The court believed Patrick's condition in and out of work should have been a factor in her disability analysis.  *Id*. at 1209.

---

[9] The other case cited by Aetna as an "on-point" carpal tunnel case, *Majeski v. Met. Life Ins. Co.*, No. 07 C 3206, 2009 WL 900983 (N.D. Ill. March 31, 2009), deals with a plaintiff diagnosed with cervical spine degeneration and resulting nerve pain, not CTS.  Also, the plaintiff in *Majeski* presented numerous differing opinions from her treating physicians as to her condition.

Case No. 08-23349-CIV-ALTONAGA/Brown

The court further found that the administrator had failed to engage in a "meaningful dialogue" with Patrick.  The court stated that

> [r]ather than having a full and open communication with her regarding the problems she was having with her <u>carpal tunnel syndrome</u>, elbow and/or shoulder, including the pain she was experiencing that might be difficult to substantiate with objective evidence, VPA merely told Plaintiff to submit evidence to substantiate her disability.

*Id*. at 1210 (emphasis in original).  Upon receiving the documentation it had requested, the administrator denied her claim, stating Patrick had not provided sufficient objective evidence of disability, but did not explain what sort of information might suffice.  *Id*. (quoting *Volynskaya v. Epicentric, Inc. Health & Welfare Plan*, 2007 WL 3036110, *7, 2007 U.S. Dist. LEXIS 81208, *18 (N.D. Cal., Oct. 16, 2007) ("'It is insufficient to simply inform a claimant that there is no 'objective' evidence to support a disability claim without specifying what type of 'objective' evidence would substantiate a claim.'").

The court noted that the administrator relied on erroneous findings of fact that had not been updated to reflect plaintiff's worsening condition and did not request an updated vocational report after receiving plaintiff's appeal.  Further, the administrator did not order a physical examination of the plaintiff, but relied on a paper review.  Admittedly, "[a]n administrator's reliance on a paper review 'does not, standing along, require the conclusion that the plan administrator acted improperly.' . . . However, 'the failure to conduct a physical examination – especially where the right to do so is specifically reserved in the plan – may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination.'" *Id*. at 1213-14 (internal citations and quotation omitted).

24

The court found the administrator should not have disregarded plaintiff's subjective evidence of pain and should not have relied on negative electrodiagnostic tests to refute a clinical diagnosis of carpal tunnel syndrome, where electrodiagnostic tests were known to produce false negatives. *Id*. at 1214-15.   Finally, the court found the administrator erred in disregarding Patrick's treating physician's opinion. *Id*. at 1215.   The administrator had relied on the opinion of the physician who performed a medical records review and disregarded the treating physician's conclusion that Patrick was disabled. *Id*.   The court stated, "[w]hile Defendants are correct that VPA need not 'accord special weight to the opinions of a claimant's physician,' it nonetheless may not 'arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician.'" *Id*. (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)).   Because there was no reason to disbelieve the treating physician's credible opinion, it was error to rely on the contrary opinion which had much less evidence behind it. *Id*.   Considering the totality of the factors of the administrator's review of Patrick's claim, the court found the administrator's decision to be wrong.[10] *Id*. at 1218-19.

*Patrick* is substantially similar to the present case.   Here, Aetna did not consider whether Gharagozloo's condition had worsened over the years.   Instead, Aetna took the position that Gharagozloo's position had improved based on a change in terminology in the Easterling reports, a change which Gharagozloo correctly points out, is meaningless.   Also as in *Patrick*, Aetna did not engage in a meaningful dialogue with Gharagozloo.   Aetna's initial denial of benefits stated the claim was being denied because the University had been accommodating Gharagozloo's disability

---

[10] The court found the decision to be not only *de novo* wrong, but an abuse of discretion.

such that he was able to perform his occupation.[11]  On appeal, Aetna did not maintain that position, but instead determined Gharagozloo was not physically disabled and denied him benefits based on a medical records reviews that relied on negative nerve conduction tests.  As in *Patrick*, Gharagozloo was not given a fair review on appeal, given that he was not adequately prepared for what would be considered on the appeal of the benefits claim.

Also similar to *Patrick* is the fact that Aetna did not have a physician perform an independent medical examination.  Instead, Aetna merely hired two physicians to review Gharagozloo's medical records.  Aetna certainly had the ability to require an independent medical examination of Gharagozloo; its choice not to do so "'raise[s] questions about the thoroughness and accuracy of the benefits determination.'"  *Patrick*, 638 F. Supp. 2d at 1214 (quoting *Calvert v. Firstar Fin. Inc.*, 409 F.3d 286, 295 (6th Cir. 2005)).  Strikingly similar to this case is the fact that the administrator in *Patrick* relied heavily on negative nerve conduction tests which the court acknowledged were known to report false negatives.  Here, Aetna was made aware that nerve conduction studies were only one element in a carpal tunnel syndrome diagnosis, and its own reviewing physician conceded that CTS can be diagnosed in the absence of a positive nerve conduction study.  Nonetheless, the two reviewing physicians' findings that Gharagozloo was not disabled were based almost entirely on the negative results of the nerve conduction studies.

---

[11] This purported reason for denial of benefits is refuted by other evidence in the record. Specifically, the record contains communication between Aetna and the University in which Aetna asked the University if it was accommodating, or willing to accommodate, Gharagozloo's disability.  The University stated it was not.  (*See* A 85).

Case No. 08-23349-CIV-ALTONAGA/Brown

Finally, as was the case in *Patrick*, Aetna disregarded the opinions of Gharagozloo's treating physicians that he was disabled from his occupation.[12]  This is not a case where the administrator merely chose between two equally reliable but contrary opinions.  Rather, Aetna disregarded the unanimous medical opinions of *five treating physicians over a ten-year period* in favor of the opinions of two reviewing physicians who relied on questionable diagnostic testing.  While Aetna did not have to "accord special weight" to the opinions of the treating physicians, it is not permitted to  arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of treating physicians.  *See id.* at 1215.  The only conceivable reason Aetna could have for crediting the opinions of the reviewing physicians over those of the treating physicians is that the reviewing physicians' opinions permitted Aetna to deny benefits.  Considering the totality of the factors, the administrator's decision that Gharagozloo was not disabled is wrong.

**B.      Did the Administrator Have Discretion?**

Because the administrator's decision was *de novo* wrong, the next step in the analysis is to determine whether the administrator had discretion in making the determination.  If the administrator had no discretion, the decision is reversed; if the administrator had discretion, the court considers

---

[12] Gharagozloo cites other carpal tunnel syndrome cases in which courts found in favor of the plaintiff.  *See, e.g., Rodden v. Jefferson Pilot Fin. Ins. Co.*, 591 F. Supp. 2d 1113, 1118 (N.D. Cal. 2008) (granting summary judgment to plaintiff with carpal tunnel syndrome who had negative nerve conduction studies); *Hyde v. The Hartford*, No. CV 07-2017 PA (CWx), 2009 WL 305560 (C.D. Cal. Feb. 5, 2009) (granting summary judgment to plaintiff with carpal tunnel syndrome who had negative nerve conduction studies).  While theses cases do find for plaintiffs with CTS notwithstanding negative nerve conduction tests, these cases were decided based on different sets of factors than those at issue in this case.  The *Patrick* case being so closely on point, and the cases cited by Aetna so factually distinguishable, discussion of these additional cases is unnecessary.

Case No. 08-23349-CIV-ALTONAGA/Brown

whether the denial was not merely wrong, but arbitrary and capricious. *White*, 542 F.3d at 853. For several reasons, Aetna had no discretion.

Aetna provides very insight as to whether it had discretionary authority under the plan. Aetna states, in its Undisputed Material Facts, "[b]y written agreement between the University and Aetna, Aetna was a claim administrator for the plan. (Doc. 1, pg. 2, ¶ 8; and A-54.) As such, Aetna had 'complete' and 'discretionary' authority to review claims and determine eligibility benefits. (A-54)." (*Aetna's Facts* at 1). In its Motion for Summary Judgment, Aetna states, "[h]ere, the plan documents expressly provide Aetna with discretionary authority to decide claims for benefits. *See* Statement of Facts, ¶ 2." (*Aetna's Mot*. at 2). In its Reply, Aetna states, "[w]here, as here, the benefits decision at issue was made pursuant to discretionary authority granted by a plan document, [summary judgment is appropriate]." (Aetna's Reply Memorandum ("*Aetna's Reply*") [D.E. 66] at 2).

According to Aetna, then, Aetna's grant of discretionary authority is found at document A1 54 in the Administrative Record. Document A1 54 is correspondence from the University of Miami to Aetna Life Insurance Company. In this letter, the University names Aetna as a designated fiduciary pursuant to ERISA, and states Aetna "shall have discretionary authority to determine whether and to what extent participants and beneficiaries are entitled to benefits, and to construe disputed or doubtful Plan terms." The letter states that the designation of Aetna as a fiduciary with discretionary authority is to become effective August 1, 2006. However, the letter is dated March,

28

Case No. 08-23349-CIV-ALTONAGA/Brown

20, 2008,[13] and Gharagozloo filed his claim on August 31, 2006.  Regardless of the date the designation of Aetna as discretionary fiduciary purportedly comes into effect, there is no evidence that the letter actually existed prior to March 20, 2008.[14]  If that is the case, then as of August 31, 2006, when Gharagozloo filed his disability claim, Aetna had no discretion to determine benefits and is consequently not entitled to the arbitrary and capricious standard of review.

Aetna does not expressly argue that the SPD  –  the document it claims controls Gharagozloo's benefits  –  provides discretion for it to make benefit decisions.[15]  Indeed, such an argument would be futile.  Under the SPD, the University delegates to Aetna authority to make determinations with respect to benefit payments under the plan and to pay such benefits, subject to the right of the University to review and modify any such determination.  (*See* A1 35).  Given the express language of the SPD, Aetna was not the administrator of the Plan, had very little discretion, and any decisions it made could be overridden by the University.

The Eleventh Circuit addressed the issue of discretionary authority in *Baker v. Big Star Div. of the Grand Union Co*., 893 F.2d 288, 290 (11th Cir. 1989).  In *Baker*, the court found that the

---

[13] The format of the letter is unusual.  There is no date at the top of the page, as with most letters. Instead, the letter contains an "Accepted" section below the signature line.  That "accepted" section contains blanks to be filled in regarding who accepted and signed, that person's title, and the date.  The date of acceptance is March 20, 2008.

[14] In his Response to Aetna's Motion for Summary Judgment, Gharagozloo raises this issue, but Aetna does not address this problem in its Reply.

[15] As noted, Gharagozloo and Aetna dispute which document controls.  The LTD Plan clearly gives Aetna no discretion, as it does not even mention Aetna as in any way involved with benefits decisions. However, because Aetna does not have sufficient discretion under the SPD, either, it is unnecessary to determine which document controls for purposes of this discussion.

Case No. 08-23349-CIV-ALTONAGA/Brown

contractholder, Grand Union Company, had contracted with Connecticut General Life Insurance to

administer the plan. The court noted that

> In 1975 the Department of Labor issued questions and answers relating to certain
> aspects of fiduciary responsibility under ERISA. In those questions and answers the
> Department stated "a plan administrator . . . must, b[y] the very nature of his position,
> have 'discretionary authority or discretionary responsibility in the administration' of
> the plan within the meaning of section 3(21)(A)(iii) of the Act. Persons who hold
> such positions will therefore be fiduciaries." 29 C.F.R. § 2509.75-8 D-3 (1988). . ..

*Id*. at 290, n.2. The court reasoned that, under the facts of the case,

> Grand Union did no more than "rent" the claims processing department of
> Connecticut General to review claims and determine the amount payable "in
> accordance with the terms and conditions of the Plan." Administrative Services
> Agreement § 2(a)(i). Grand Union reserved the right to review any and all claim
> denials. *Id*. at § 2(b). An insurance company does not become an ERISA "fiduciary"
> simply by performing administrative functions and claims processing within a
> framework of rules established by an employer, *Gelardi v. Pertec Computer Corp*.,
> 761 F.2d 1323, 1325 (9th Cir. 1985), especially if, as in this case, the claims
> processor has not been granted the authority to review benefits denials and make the
> ultimate decisions regarding eligibility.

*Id*. The court explained that while "the indicia of discretionary authority granted to administrators

or fiduciaries will differ with each ERISA plan reviewed by a given court," express language of

discretionary authority is necessary before the arbitrary and capricious standard is applicable. *Id*. at

292.

Another district court examined the requirement of an express grant of discretionary authority

in some detail in *Culp, Inc. v. Cain*, 414 F. Supp. 2d 1118 (M.D. Ala. 2006). In *Culp*, the court

explained,

> ERISA allows for the delegation of a fiduciary's discretion to another entity, but only
> when such delegation is explicitly authorized by the plan instrument. Because the
> Plan's summary description does not authorize Culp to delegate its discretion to
> another entity, Culp could not delegate any of its discretion to BMS.

30

> In short, the summary description does not grant BMS "any discretionary authority or discretionary responsibility in the administration" of the Plan, 29 U.S.C. § 1002(21)(A)(iii) (defining "fiduciary" under ERISA). Indeed, it does not grant BMS any discretion at all. Because BMS was not granted "*any* discretion" by the summary description, its decisions do not warrant any deference. *Firestone*, 489 U.S. at 113, 109 S.Ct. 948 (emphasis in original).

*Id.* at 1126.

The facts here are comparable to those in *Baker* and *Culp*. The University did not expressly grant discretionary authority to Aetna to make claim determinations. In the SPD, the University expressly named itself the plan administrator, and reserved the right to review and modify any determination made by Aetna.[16]

As noted, although Gharagozloo challenged Aetna's discretionary authority under the plan in its Response to Aetna's Motion for Summary Judgment, Aetna did not address the issue in its Reply. It merely stated that such authority exists. Aetna did not address the language in the SPD which, under its plain terms and ERISA case law, does not grant Aetna discretionary authority.[17] Neither did Aetna address the fact that the document upon which it relied for the grant of authority – the letter from the University to Aetna – is dated March 20, 2008, almost two years after

---

[16] The mere fact that the SPD names the University as the administrator is not dispositive as to whether Aetna had discretion regarding claims decisions. *See, e.g., Marquez-Massas*, 344 F. Supp. 2d at 322, n. 5. In *Marquez-Massas*, the fact that the contract holder was named as the administrator was irrelevant as it was clear that the insurance company performed actual claims administration.

[17] In cases where the court found discretionary authority did exist, the plan contained much more explicit language granting that authority. *See, e.g., Patrick,* 638 F. Supp. 2d at 1204 ("Under the Plan and ASA, VPA is authorized to process claims, determine eligibility for and the amount of any benefits, and render decisions on appeals of denied claims. Furthermore, VPA is unambiguously granted the discretion to construe Plan language and make decisions on review on behalf of HP"). None of that explicit language or anything similar to it appears in the University/Aetna Plan.

Case No. 08-23349-CIV-ALTONAGA/Brown

Gharagozloo made his claim for disability benefits.  This after-the-fact letter cannot serve to confer discretionary authority on Aetna as to Gharagozloo's claim, when the language in the SPD does not expressly grant such discretion.  Accordingly, Aetna's decisions are afforded no deference, and are reviewed under the *de novo* standard.

Pursuant to the Eleventh Circuit's process for review of benefit denials under ERISA, the inquiry may end here, with a reversal of Aetna's denial of benefits.  However, because Aetna's decision was not only wrong, but also an abuse of discretion, the next step in the process is addressed.

### C.      Was There a Reasonable Basis for the Administrator's Decision?

Under arbitrary and capricious review, "the plan administrator's decision to deny benefits must be upheld so long as there is a 'reasonable basis' for the decision."  *Oliver v. Coca Cola Co.*, 497 F.3d 1181, 1195 (11th Cir. 2007), *reh'g granted and partially vacated on other grounds*, 506 F.3d 1316 (11th Cir. 2007) (quoting *Jett v. Blue Cross & Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1140 (11th Cir. 1989)).  "The district court's review of the plan administrator's denial of benefits should be limited to consideration of the material available to [the administrator] at the time it made its decision." *Id.*; *Lee v. Bellsouth Telecomms., Inc.*, 318 F. App'x 829, 836 (11th Cir. 2009).

Aetna claims it acted reasonably by relying on the reviewing physicians' reports, which determined that Gharagozloo could not be suffering from CTS based on the negative nerve conduction studies.  Aetna asserts that Gharagozloo did not provide objective medical evidence of his disability, and the reviewing physicians were correct to base their determination of his lack of disability on the electrodiagnostic studies.  Gharagozloo counters that to place so much weight on

32

Case No. 08-23349-CIV-ALTONAGA/Brown

one factor against disability, while ignoring the great weight of the medical evidence in favor of a finding of disability, is unreasonable.  A review of ERISA case law supports the conclusion that Aetna's decision was indeed unreasonable.

Aetna cites *Midgett v. Washington Group Int'l LTD Plan*, 561 F.3d 887 (8th Cir. 2009), in support of its position that it acted reasonably in relying on the reviewing physicians' reports.  In *Midgett*, the plaintiff was diagnosed by her treating physician, Dr. Tejada, as suffering from several maladies, including avascular necrosis and fibromyalgia.  *Id*. at 890.  A hand surgeon, Dr. Moore, opined that Midgett's problems were consistent with "degenerative arthritis of the right long finger MP joint."  *Id*.  Dr. Rutherford, a neurologist, administered a nerve conduction study, a sensory nerve conduction study, and a needle examination.  *Id*.  The results of the tests were normal, and the neurologist concluded that "[t]here is no evidence via electrodiagnostic parameters to suggest cervical radiculopathy, brachial plexopathy, ulnar neuropathy or median neuropathy right upper extremity."  *Id*.  Midgett then visited another doctor, Dr. Harris, who diagnosed her with fatigue and fibromyalgia.  *Id*.

Midgett applied for and was denied disability benefits.  *Id*.  She was then examined by a chiropractor, who deemed her disabled.  *Id*.  The defendant disability plan asked Dr. Sherrer, a rheumatologist, to perform a peer review of Midgett's medical records.  *Id*.  Dr. Sherrer concluded that the record did not support a finding of functional impairment that would prevent Midgett from performing her sedentary duties as an assistant contract manager.  *Id*. at 891.  Dr. Sherrer conducted a second peer review which included the chiropractor's report on Midgett's condition.  *Id*.  Dr.

Case No. 08-23349-CIV-ALTONAGA/Brown

Sherrer concluded her original decision was correct, and the records did not indicate that Midgett could not perform her sedentary job. *Id.*

Four additional peer reviews were completed, with each reviewing physician concluding that Midgett suffered from various different problems, but all concluding that her symptoms were not so severe as to render her unable to perform her occupation. *Id.* Midgett visited two more doctors. *Id.* at 891-92. One stated she was totally disabled; the other opined that her pain was under fairly good control and she did not demonstrate any significant pathologies. *Id.* Midgett visited still another doctor who found she could sit for two hours in an eight hour workday, stand or walk for two hours in an eight hour workday, and could lift up to ten pounds. *Id.* at 892. Midgett's first-level appeal was denied, and she appealed. *Id.* Three more peer reviews were performed. An orthopedic surgeon, a neuropsychologist, and a rheumatologist each opined that medical evidence did not indicate that Midgett could not perform her job duties. *Id.* Midgett's second-level appeal was denied. *Id.*

On review, the district court upheld the denial of benefits, and the Eight Circuit affirmed. On appeal, Midgett argued that the administrator was unreasonable because he had relied on the peer reviewing doctors, who had not physically examined her, instead of relying on the opinions of her treating physicians, who had examined her. *Id.* at 897. The court noted that treating physicians are not necessarily accorded special weight in ERISA decisions, and explained, "'a plan administrator has discretion to deny benefits based upon its acceptance of the opinions of reviewing physicians over the conflicting opinions of the claimant's treating physicians unless the record does not support

34

Case No. 08-23349-CIV-ALTONAGA/Brown

the denial.'" *Id.* (quoting *Dillard's, Inc. v. Liberty Life Assurance Co. of Boston*, 456 F.3d 894, 899-900 (8th Cir. 2006)).

Midgett argued the peer reviews were "conclusory," and attempted to align her case with the decision in *Kalish v. Liberty Mutual/Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 511 (6th Cir. 2005). *See* 561 F.3d at 897-98. The court in *Kalish* specifically noted that the plan administrator had relied exclusively on the conclusion of a single peer reviewer who had not physically examined the claimant and rejected the conclusion of a physician who had examined the claimant on numerous occasions. *Id.* at 898. Midgett's case was entirely different. Midgett's examining doctors themselves reported conflicting diagnoses, and the eight doctors performing peer reviews acknowledged the diagnoses of the examining physicians, concurring that the reports did not support a finding of disability. *Id.* The court also noted that the nerve conduction and needle studies performed on Midgett were normal, and ultimately concluded that, "[i]n light of the conflicting medical opinions in this case, the denial of Midgett's short-term disability claim was not arbitrary and capricious." *Id.*

Aetna suggests that *Midgett* is comparable to this case. Aetna states,

[g]iven the normal nerve conduction studies, Dr. Easterling and Dr. Lichtblau were clearly correct in their shared assessment that a neuropathy was not evidenced. *See Midgett v. Washington Group Int'l LTD Plan*, 561 F.3d 887, 890 (8th Cir. 2009) (affirming summary judgment for administrator in part because "nerve conduction study" was "normal," and the physician who performed the study therefore found "no evidence via electrodiagnostic parameters to suggest ... ulnar neuropathy or median neuropathy" in plaintiff's "right upper extremity").

(*Aetna's Mot*. at 7). This attempt to analogize this case to *Midgett* is a gross oversimplification and misrepresentation of the totality of the facts in *Midgett*. In *Midgett*, plaintiff's own physicians came

35

Case No. 08-23349-CIV-ALTONAGA/Brown

up with conflicting diagnoses and most did not deem her disabled.  The eight peer-reviewing physicians considered the multitude of medical evidence before them and determined that Midgett was not disabled.  The administrator, faced with multiple conflicting diagnoses from Midgett's treating physicians, relied on the consensus among the reviewing physicians.

The facts of this case are notably different.  Gharagozloo had five separate treating physicians state that his physical condition precluded him from working full-time at a keyboard.  Most of the doctors used the term "carpal tunnel syndrome" to describe his condition, and those who did not used synonymous terms.  This is not a case where, as in *Midgett*, one doctor diagnosed arthritis, another fibromyalgia, and another fatigue, and few concurred he was disabled.  Gharagozloo's medical records contain consistent, documented diagnoses from several doctors, over a period of years, all of whom agreed Gharagozloo could not perform his occupation due to his physical disability.

In this case, the administrator ignored all of Gharagozloo's records in favor of the reports from two record-reviewing physicians.  Cohan and Rangaswamy disagreed with the examining doctors' diagnoses that Gharagozloo suffered from CTS based entirely on the normal nerve conduction studies.  Cohan stated that while tinel and phalen signs [signs of CTS] were present, he decided that, based on the nerve conduction test, Gharagozloo did not have CTS.  Cohan's report stated that:

> While I do agree that those diagnoses can be made on clinical grounds in the presence of normal electrodiagnostic testing, that particular scenario would be expected earlier in the history of such a condition, but given a period of ten years of continued clinical symptomatology, one would expect progressively abnormal electrodiagnostic finds and the presence of abnormal neurological exam signs including sensory and motor abnormalities consistent with the anatomic distribution of the bilateral median and/or ulnar nerves and the presence of atrophic changes of the relevant intrinsic muscles of the hands.  Therefore, it is my opinion that the

36

Case No. 08-23349-CIV-ALTONAGA/Brown

particular diagnoses opined in this case are subject to question and cannot be accepted based on the information submitted.

(A5 450).  Similarly, Rangaswamy stated:

The claimant's complaints are diffuse and ill-defined and do not follow characteristic patterns of an entrapment neuropathy.  Furthermore, the EMG/NCV studies of both upper extremities have been consistently normal.  If the claimant had a definite pathological lesion, over the years the electrophysiological study would have shown definitive involvement.  Therefore, based on consistently normal electrophysiological studies, one must conclude that the claimant in fact does not have any evidence of peripheral entrapment neuropathy.

(A5 458).

"[A] plan administrator has discretion to deny benefits based upon its acceptance of the opinions of reviewing physicians over the conflicting opinions of the claimant's treating physicians *unless the record does not support the denial*." *Dillard's, Inc.*, 456 F.3d at 899 (emphasis added). As noted, the facts here are not comparable to *Midgett*.  Gharagozloo's treating physicians agreed on both his diagnosis and the fact that his condition prevented him from working at his occupation. The only evidence to refute those diagnoses was the normal nerve conduction study, which many doctors agree is not dispositive as to the existence of CTS.  Easterling specifically stated that "[n]erve conduction studies are only one element of painful peripheral neuropathy, and electrodiagnostic findings do not always correlate well with clinical findings and symptoms." (A2 179).  In this case, unlike *Midgett*, the record simply does not support the denial.[18]

_____

[18] Aetna also cites *Richey v. Hartford Life & Accident Ins. Co.*, 608 F. Supp. 2d 1306 (M.D. Fla. 2009), and *Hufford v. Harris Corp.*, 322 F. Supp. 2d 1345 (M.D. Fla. 2004)(*see Aetna's Mot.* at 9), both of which are distinguishable.  In *Richey*, the plaintiff's own treating neurologist stated she was not disabled. Unlike this case, the physician who reviewed Richey's records *agreed* with the opinion of the treating physician.  In *Hufford*, plaintiff's treating physicians reported that her condition had improved and was likely to continue to improve.  Upon receipt of these reports, the administrator requested peer review of plaintiff's

37

Case No. 08-23349-CIV-ALTONAGA/Brown

In *Lee v. Bellsouth Telecomms., Inc.*, 318 F. App'x. 829, 837 (11th Cir. 2009), the Eleventh

Circuit overturned the district court's approval of an administrator's denial of plaintiff's disability

benefits.  Plaintiff, Suzanne Lee, suffered from chronic pain syndrome due to thoracic disc disease.

*Id*. at 830.   Lee filed an application for long term disability benefits from her employer, Bellsouth.

*Id*.  Bellsouth denied her claim, and Lee appealed.  *Id*.  In her appeal, Lee filed statements from

several treating physicians, attesting that she suffered from thoracic disc disease, which caused her

extreme pain such that she was unable to work.  *Id*. at 830-833.  The treating doctors all concurred

that Lee could not sit for more than one  to one-and-one-half hours, could not stand for more than

10 minutes, and was unable to work in any capacity due to her extreme pain.  *Id*.  Lee also submitted

a CAT scan and MRI which showed disc herniations and protrusions.  *Id*. at 833.

Broadspire, the Plan administrator, asked Dr. Goldberg to review Lee's medical records to

determine if she was disabled.  *Id*. at 834.  Dr. Goldberg concluded that Lee had failed to support her

impairment because, in his opinion, the level of pain described in her medical reports far exceeded

the nature of the abnormalities described in the MRI.  *Id*.  Dr. Goldberg stated that "[n]o neurologic

deficits are present and based on the information that is available; there is a lack of objective data

to support disability from any occupation as of January 18, 2005 onward."  *Id*.  Another doctor

performed a peer review of Lee's records, and determined that while Lee's doctors stated she could

not sit for more than one-and-one-half hours, could not work more than two to four hours per day,

file.  Ten independent physicians reviewed the records and agreed plaintiff was not disabled.  In this case,
none of Gharagozloo's treating physicians ever reported or even speculated that his condition could improve.
*Hufford* is also distinguishable because it involved a determination of whether the plaintiff was totally
disabled from *any* occupation, not only her own occupation, which necessarily involves a different level of
analysis.

38

Case No. 08-23349-CIV-ALTONAGA/Brown

and required analgesics and muscle relaxants, these "statements are obviously a reflection of the claimant's subjective reports to them, and do not provide any objective documentation to substantiate their statements that the claimant is unable to work." *Id*.

On review, the court noted that

Traditionally, laboratory and other quantitative medical testing, such as MRIs, CAT Scans, and functional impairment tests, are considered objective medical evidence. *Oliver*, 497 F.3d at 1197. In addition, under *Oliver*, the consistent diagnosis of chronic pain syndrome by Lee's physicians along with the consistent observations of physical manifestations of her condition do in fact constitute objective medical evidence. *Id*. This is so because

much medical evidence, especially as it relates to pain, is inherently "subjective" in that it cannot be quantifiably measured. Indeed, the only evidence of a qualifying disability may sometimes be the sort of evidence . . . characterize[d] as "subjective," such as physical examinations and medical reports by physicians, as well as the patient's own reports of his symptoms.

*Id*. at 1196. There is, quite simply, no laboratory dipstick test to diagnose chronic pain syndrome.

*Id*. at 837 (quoting *Oliver v. Coca Cola Co*., 497 F.3d 1181, 1196 (11th Cir. 2007).

The court determined the administrator's decision to deny benefits was arbitrary and capricious in light of the medical evidence presented by Lee. *Id*. at 840. The court explained that the reports from Lee's treating physicians were themselves objective medical evidence, as were the MRIs and CAT scans. The physician who reviewed Lee's medical records believed the conclusions of the treating physicians were unwarranted because, he felt, the conclusions were based on the patient's subjective reports of pain. *Id*. at 839. The court noted that while the patient's subjective reports of pain were considered by her treating physicians, those doctors based their opinions upon

39

Case No. 08-23349-CIV-ALTONAGA/Brown

multiple clinical observations.  The administrator should not, therefore, have disregarded the opinions of the two treating physicians.  *Id.*

In *Lyncker v. Johnson & Johnson Pension Committee*, 505 F. Supp. 2d 1303 (M.D. Fla. 2006), the district court reversed the administrator's denial of benefits to plaintiff, Clara Lyncker. Lyncker worked for Johnson & Johnson in a sedentary, administrative position for several years. *Id*. at 1305.  In November 2001, Lyncker was treated for bronchial asthma.  *Id*. at 1307.  Lyncker's treating physician stated that Lyncker could not work for approximately six weeks due to her severe wheezing, bronchospasms, chest pain, and extreme fatigue.  *Id*.  Lyncker returned to work in December 2001.  In April 2002, Lyncker was diagnosed with chronic inappropriate tachycardia (an abnormally high resting heart rate which increased dramatically with minimal exertion) along with dyspnea (shortness of breath).  *Id*.  An echocardiogram revealed a mitral valve problem.  *Id*.

Lyncker applied for long term disability benefits.  She reported that her conditions prevented her from going out in public because she was subject to respiratory infections; that she was on numerous medications that made her drowsy and dizzy; and that she suffered from pain in her chest and neck, along with pain in her knees and ankles.  *Id*.  Lyncker's treating physician submitted a report indicating that Lyncker was unable to perform sedentary work due to her physical maladies. *Id*.  Lyncker visited a rheumatologist, who, through x-rays, determined that she was suffering from degenerative conditions in her knees.  *Id*.

The Plan administrator asked a pulmonologist, Dr. Klotz, to have a peer to peer meeting with Lyncker's treating physician to determine whether Lyncker was permanently and totally disabled. *Id*.  The peer review form noted that Dr. Klotz had reviewed the treating physician's progress notes,

40

Case No. 08-23349-CIV-ALTONAGA/Brown

and Dr. Klotz concluded that Lyncker's records did not support a finding of functional impairment.

Dr. Klotz contacted Lyncker's treating physician by phone, at which time the treating physician

reportedly stated, that

> while Lyncker experienced several exacerbations of her symptoms (occurring every
> two to three months), they did not require hospitalization and could be treated with
> increased levels of Prednisone. (*Id*. at Lyncker 0090). Dr. Klotz also noted that Dr.
> Prabhu told him that Lyncker was able to walk without significant difficulty and that
> she was able to work in a sedentary position, but restrictions were that the workplace
> had to be "dust and fume free (including perfume) and not have extremes of
> temperature." (*Id*.).

*Id*. at 1307-08.  Lyncker's claim for disability benefits was denied.  *Id*. at 1308.

> In her appeal, Lyncker submitted a report from her treating physician which stated:

> [I]t is my professional opinion that Mrs. Lyncker suffers from severe recalcitrant
> steroid dependent (only partially responsive) chronic perennial progressive asthma.
> She has a persistent smoldering type of asthma in that we have been able to keep her
> out of the emergency room and hospitals due to intensive therapy, an open
> communication line with the office and pulse therapy with Prednisone.  However
> despite maximal and aggressive management plan, she continues to have frequent
> flare ups, superimposed upon her baseline respiratory difficulty, characterized by
> asthmatic bronchitis type symptoms.  It is my opinion that her respiratory impairment
> as well as significant sensitivity to irritants such as perfumes, colognes, second hand
> smoke, cleaning agents, wind draft, cold air as well as exertion and her frequency of
> exacerbations of asthma as a result of respiratory infection…it is not possible for
> Mrs. Lyncker to hold regular gainful employment at this time.

*Id*. at 1309.  The treating physician also prepared an assessment of ability report, in which he stated

that

> (1) Lyncker was limited to carrying less than five to ten pounds due to "compromised
> lung function" and "chronic, severe, ongoing asthma," (2) it cannot be predicted as
> to how many hours in an eight hour work day that Lyncker can stand and walk
> because it depends on the severity of her exacerbation on a particular day, (3)
> Lyncker's ability to sit is unimpaired, (4) Lyncker requires rest periods during the day
> and (5) temperature extremes, chemicals, dust, fumes and humidity exacerbate her
> asthma.

41

Case No. 08-23349-CIV-ALTONAGA/Brown

*Id*. Lyncker applied for social security benefits, and the Social Security Administration found Lyncker to be totally disabled. *Id*. Lyncker then underwent a knee replacement. *Id*.

The plan administrator hired three peer reviewers to assess Lyncker's medical records: a pain management specialist, a psychologist, and an internal medicine specialist. *Id*. The internal medicine specialist noted that while Lyncker had a history of asthma, the records contained no documentation that she was unable to work. *Id*. The pain management specialist concluded that the records contained insufficient data to support a finding that Lyncker could not perform a sedentary job. *Id*. at 1310. The psychologist determined that Lyncker's records contained no evidence that she was unable to work due to any mental health problems. *Id*. Lyncker's appeal was denied. *Id*. Lyncker's treating physician sent a letter to Lyncker's counsel, which was submitted to the plan administrator. Lyncker's treating physician explained that Dr. Klotz's report did not accurately convey his opinions concerning Lyncker's condition, and he maintained Lyncker was unable to work. *Id*. The administrator did not contact Lyncker's physician for clarification and made a final denial of benefits. *Id*.

The district court found the administrator's decision was not only wrong, but unreasonable. The court noted that the reviewing physician apparently misinterpreted the opinion of the treating physician. Moreover, the court pointed out that

> Dr. Klotz, on the other hand, never saw Lyncker, never treated or evaluated her and merely relied on his (apparently mistaken) understanding of one conversation he had with Dr. Prabhu. While the undersigned is well aware that in *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003), the Supreme Court explicitly rejected a treating physician rule, nothing in *Nord* provides support for a plan administrator "arbitrarily refus[ing] to credit a claimant's reliable evidence, including the opinions of a treating physician" *Shaw v. Connecticut General Life Ins. Co.*, 353 F.3d 1276, 1287 (11th Cir. 2003) (quoting

42

> *Nord*, 538 U.S. at 834). Thus, where, as here, a treating physician has consistently
> and repeatedly espoused a view and supported it with medical findings, the
> administrator may not reject it based solely on the unsupported and unreliable
> opinion of a reviewing physician.

*Id*. at 1314 (footnote call number omitted).

The administrator's decision in Gharagozloo's case is comparable to the administrators'
decisions in *Lee* and *Lyncker*: all are wrong and unreasonable. Gharagozloo supplied ample,
competent medical evidence that he was disabled. His treating physicians consistently diagnosed
him with carpal tunnel syndrome, which was documented as growing progressively worse. There
was no evidence that Gharagozloo was a malingerer. His treating physicians and independent
medical examiner unequivocally concurred that Gharagozloo could no longer perform his job as a
computer programmer. Accordingly, the administrator acted unreasonably by disregarding such
consistent findings and basing its decision on the opinions of reviewing physicians who were
admittedly relying on unreliable nerve conduction studies.

The case closest on point to this case is *Patrick v. Hewlett Packard*, discussed at length.[19]
In that case, the court found the administrator's denial of Patrick's disability claim not only wrong,
but an abuse of discretion. The same conclusion is mandated here. In the face of overwhelming
evidence supporting a finding that Gharagozloo is unable to perform his occupation, Aetna abused

---

[19] The cases noted are by no means an exhaustive list. Additional cases exist in which courts have
taken issue with administrators' decisions to rely on evidence that supports a denial of benefits and de-
emphasize or ignore reports that support a finding of disability. *See, e.g., Metro. Life Ins. Co. v. Glenn*, 128
S. Ct. 2343 (2008); *Beckstrand v. Elec. Arts Group Long Term Disability Ins. Plan*, No. 1:05-CV-0323 AWI
GSA, 2008 WL 4279566 (E.D. Cal. Sept. 16, 2008).

Case No. 08-23349-CIV-ALTONAGA/Brown

its discretion by relying on the contrary opinions of the reviewing physicians.  Accordingly, Aetna's decision to deny benefits to Gharagozloo is reversed.

## IV.  CONCLUSION

In light of the foregoing, it is hereby

**ORDERED AND ADJUDGED** that

1.      Defendants' Motions for Summary Judgment **[D.E. 44, 46]** are **DENIED**.  Judgment is entered in favor of Gharagozloo and against Defendants, Aetna and the University.

2.      Aetna's denial of benefits is **REVERSED**.   Aetna shall immediately award Gharagozloo the long term disability benefits to which he is entitled.[20]

3.      This case is **CLOSED**.

4.      All other pending motions are **DENIED** as moot.

5.      No motions for attorney's fees or costs will be entertained until after the time for filing an appeal has passed, and any such motion must be accompanied by the Local Rule 7.1 A.3 certification.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 5th day of November , 2009.

_Cecilia M. Altonaga_

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:  counsel of record

---

[20] Pursuant to the LTD Plan or the SPD, Gharagozloo is entitled to a minium of either 60 months or two years of disability benefits, respectively, because he is disabled from his own occupation.  After that time period, Gharagozloo would be entitled to continued benefits if he could perform no reasonable occupation.